# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

CAROL HAYTER,

                    Plaintiff,

-vs-                                                    Case No.  6:05-cv-1087-Orl-JGG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

_____

## MEMORANDUM OF DECISION

Plaintiff Carol Hayter ["Hayter"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

On December 4, 2000, Hayter filed a claim for disability insurance benefits, claiming disability as of September 30, 1999 due to disk bulges and herniations in her back and neck and pain and numbness in her back and arms.  R. 47 - 49.  Her claim was denied initially and upon reconsideration.  R. 37, 43.  On September 10, 2002, the Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"], held a hearing on Hayter's claim in Orlando, Florida.  R. 352 - 407.  Attorney James Keeter represented Hayter at the hearing.  R. 352.  The ALJ heard testimony from Hayter and Dr. Robert SanPhilippo, an impartial vocational expert.

On October 21, 2002, the ALJ issued a decision that Hayter was disabled from September 10, 1999 through August 12, 2001, and was entitled to benefits for that time period. R. 242 - 44, Finding 13. The ALJ found that Hayter was not disabled after August 12, 2001, and not entitled to benefits after that date. *Id.* Following a review of the medical and other record evidence, the ALJ found that between September 30, 1999 and August 12, 2001, Hayter could not perform her past relevant work as a housekeeper. R. 244, Finding 9. The ALJ found that Hayter's medical condition improved on August 13, 2001, and beginning on that date, Hayter retained the residual functional capacity ["RFC"] to lift no more than twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour workday; and stand and walk for two hours in an eight-hour workday. R. 244, Findings 10, 12. After hearing testimony from the vocational expert, the ALJ concluded that Hayter was not disabled after August 12, 2001.[1] R. 244 - 45, Findings 14, 15.

On May 6, 2004, the Appeals Council granted review. R. 255. On July 15, 2004, the Appeals Council entered an order remanding the case to the ALJ. The Appeals Council first observed that the ALJ essentially relied on one magnetic resonance image ["MRI"] dated July 2000 to conclude that Hayter was disabled for the period from September 30, 1999 through August 12, 2001. R. 260. The Appeals Council noted that the ALJ did not address statements and findings by Hayter's treating physician that showed that Hayter could work and had no neurological deficits. *Id.* The ALJ also relied on an August 13, 2001 MRI to conclude that Hayter had improved, but according to the Appeals

---

[1] The Social Security ALJs face a herculean task. The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals. With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases. The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

Council, the differences between the two MRI reports "are not sufficient to find that there was medical improvement related to the ability to work." R. 261.

In addition, the Appeals Council noted that the ALJ failed to provide an evaluation of Hayter's subjective complaints, or a finding on Hayter's credibility. *Id.* The Appeals Council directed the ALJ, upon remand, to obtain additional evidence (including updated treating physicians' reports, medical source statements, and consultative examinations); to re-evaluate opinion evidence and explain the weights given to those opinions; to reconsider Hayter's RFC; to evaluate Hayter's subjective complaints; to obtain a medical expert to clarify the significance of various MRI findings; and to hear supplemental testimony from a vocational expert on Hayter's occupational base. R. 261 - 62.

After the Appeals Council remand, the ALJ held a forty-minute supplemental hearing on Hayter's claim on September 21, 2004 in Orlando, Florida. R. 408 - 40. Attorney James Keeter represented Hayter at the hearing. R. 408. The ALJ heard testimony from Hayter and Jane Beougher, an impartial vocational expert. R. 409.

On January 25, 2005, the ALJ issued a decision that Hayter was not disabled and not entitled to benefits "at any time through the date of the decision." R. 15 - 23, Finding 13. Following a review of the medical and other record evidence, the ALJ found that Hayter could not perform her past relevant work as a maid. R. 20 - 22, Finding 7. The ALJ found that Hayter nevertheless retained the RFC to perform the physical exertional requirements of sedentary work. R. 22, Finding 6. More specifically, the ALJ found that Hayter could lift a maximum of ten pounds; was limited in her abilities to bend and stoop; and had to avoid prolonged periods of sitting, standing, and excessive and repetitive movement of her neck. *Id.* After hearing testimony from the vocational expert and applying

-3-

the Medical-Vocational Guidelines, the ALJ concluded that Hayter was not disabled at any time after the alleged onset date.  R. 23, Findings 12, 13.

After the ALJ's decision —  but before the Appeals Council decision — Hayter submitted additional medical records covering the period from July 29, 2000 through November 2002.  R. 6 - 10, 329 - 39, 340 - 41.[2]  The additional records included reports from Shepherd's Hope, Inc. covering the period from August 21, 2002 through November 22, 2002, and a letter dated February 14, 2005 from Dr. Vincent Giuliano, M.D.  R. 10, 329 - 39, 340 - 41.  In the letter, Dr. Giuliano summarized prior findings from MRI's dated July 19, 2000 and August 13, 2001.  R. 340 - 41. After considering these additional medical records, the Appeals Council denied review, stating that the ALJ's decision correctly concluded that Hayter could perform a significant range of sedentary work, including the jobs identified by the vocational expert.  R. 6 - 7, 10.

The Appeals Council evaluated the "new evidence" that Hayter submitted to the Appeals Council.  R. 7.  According to the Appeals Council, the Shepherd's Hope, Inc. records were "cumulative to earlier and later reports" already considered by the ALJ.  *Id.*  The Appeals Council further noted that Dr. Giuliano was not a treating or examining physician, and his "vague" statements that Hayter's impairment "justifies social security disability compensation . . . is a conclusion on issues reserved for the Commissioner of Social Security, and is given no weight."  *Id.*

On July 22, 2005, Hayter timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1, ¶ 3.  On December 14, 2005, Hayter filed in this Court a memorandum of law in support of her appeal.  Docket No. 15.  On February 8, 2006, the

---

[2]Hayter's counsel also submitted a letter of arguments to the Appeals Council dated March 14, 2005, but no new evidence after November 2002.  *See* R. 10, 342 - 51.

Commissioner filed a memorandum in support of her decision that Hayter was not disabled.  Docket No. 16.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Hayter assigns three errors to the Commissioner.  First, Hayter claims that the Commissioner erred by improperly evaluating the new evidence submitted to the Appeals Council after the second ALJ decision.  Docket No. 15 at 18.  According to Hayter, the evidence was "new and material," and therefore, the Appeals Council improperly denied review.  *Id.* at 18 - 20.  Second, Hayter alleges that the Commissioner erred by failing to make a specific finding as to whether Hayter's upper extremity impairments affected her ability to perform the requirements of unskilled sedentary work.  *Id.* at 22 - 23.  Third, Hayter claims that the Commissioner erred in by failing meet her burden to establish that Hayter could perform other work that exists in the national economy.  *Id.* at 23 - 25.  More specifically, Hayter argues that the ALJ failed to accurately describe Hayter's limitations in her hypothetical questions to the vocational expert.  *Id.*

The Commissioner argues that substantial evidence supports her decision to deny disability.  First, the Commissioner argues that the only "final decision" of the Commissioner that is subject to review by the district court is the ALJ 's decision, and not the Appeals Council's decision to deny review.  Docket No. 16 at 4 - 6.  The Commissioner contends that the Court must evaluate the additional evidence under a three-pronged standard used to evaluate new evidence submitted to the Court.  *Id.* at 5 - 6.  The Commissioner contends that the additional evidence was not "material" and could not reasonably have been expected to change the administrative result.  *Id.* at 6 - 9.  Second, the Commissioner argues that the ALJ properly considered all of Hayter's impairments, and accurately

determined Hayter's RFC in light of these impairments. *Id.* at 9 - 12. Third, the Commissioner argues that the ALJ's hypothetical question to the vocational expert was a complete and accurate assessment of Hayter's limitations and abilities. *Id.* at 12 - 16.

### III.   THE STANDARD OF REVIEW

#### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B.     REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

**C.     REMAND**

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.

*Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is

a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3] *Id.*

### D.    STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE

As stated earlier, after the ALJ's decision —  but before the Appeals Council decision — Hayter submitted additional medical records from July 29, 2000 through November 2002. R. 6 - 10, 329 - 39, 340 - 41. If a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application." 20 C.F.R. § 404.976(b)(1)(2005). The Appeals Council did

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

not return the additional evidence to the claimant.  Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review.  R. 6 - 10.  In fact, as described earlier, the Appeals Council evaluated the new evidence, and found that the additional records did not controvert the ALJ's findings and conclusions.  R. 7.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g).   The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary

responsibility for identifying and developing the issues. *Sims*, 120 S.Ct. at 2086.  When the Appeals

Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's

decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*,

120 S.Ct. at 2086;  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th

Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider

new evidence and then denies review.  *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for

a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence

presented to the Appeals Council — in reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d

at 1066.

     The Appeals Council must consider and evaluate new evidence to determine whether there is

a basis for changing the ALJ's decision. *Sims*, 120 S.Ct. at 2086;  *Falge v. Apfel*, 150 F.3d 1320, 1322

n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to

the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by

substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*,

983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never

presented to him).  Nevertheless, there is an important difference between *Falge* and this case — a

difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the

claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the

*ALJ's decision* to deny benefits.  150 F.3d at 1324.  In this case, however, the claimant does expressly

appeal and seek a reversal of the Appeals Council's decision to deny review.  *See* Docket No. 1 at 1,

¶ 2; *see also* Docket No. 15 at 17.  The Eleventh Circuit directs the district courts to consider evidence

-11-

submitted to the Appeals Council in reviewing the Appeals Council's denial of review. *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies. When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. *Sims*, 120 S.Ct. at 2086; *Keeton*, 21 F.3d at 1066. Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record). The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable

-12-

statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence.  The Appeals Council's determination is subject to judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review."  *See Sims*, 120 S.Ct. at 2086; *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662

-13-

F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

## B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

-15-

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.     OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.       TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical

evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other

evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.   MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

-21-

**V.     APPLICATION AND ANALYSIS**

**A.     THE FACTS**

Hayter was born on October 3, 1960, and was forty-three years old on the date of the second ALJ hearing.  R. 47, 358, 410.  Hayter completed high school, and has worked as a housekeeper and an information manager at a lumber yard.  R. 61, 359.  Hayter alleges disability as of September 30, 1999, due to disc bulges in her neck and back, herniations in her neck and back, significant loss of cervical lordosis, pain in her muscles, and numbness in her arms.  R 70.

Hayter injured her right arm in an automobile accident in 1986, but continued to work as a housekeeper.  R. 61, 133, 212.  In 1997 and 1998, Hayter sought treatment for carpal tunnel syndrome with Dr. Michael Marion, M.D.  R. 205 - 07.  In his treatment notes, Dr. Marion indicates that Hayter's "date of injury" was May 17, 1997, and that Hayter underwent surgery on August 12, 1997 for her right arm and on September 17, 1997 for her left arm.  R. 205, 207.  Hayter did not submit any treatment notes from 1997.  According to the earliest record, on January 14, 1998, Hayter visited Dr. Marion for a follow-up appointment five months after surgery, and complained of pain in her palms around the areas of incision.  R. 207.

Dr. Marion's physical examination revealed "excellent" wrist and digital range of motion, and well-healed incisions on her palms.  *Id.*  Dr. Marion diagnosed severe bilateral carpal tunnel syndrome ["CTS"], and lateral epicondylitis (tennis elbow) which was greater on her right side than her left side. *Id.*  Dr. Marion advised Hayter that her motor strength would likely return in one to two years, and that the pain in her palms would diminish.  *Id.*  He also stated that Hayter did not need further medical treatment, and imposed permanent "light duty" work restrictions.  R. 207.  Hayter was to avoid

repetitive pinching and grasping; use padded gloves as needed; and lift no more than fifty pounds occasionally, twenty pounds frequently, and ten pounds constantly and bilaterally.  *Id.*  Dr. Marion stated that Hayter was at Maximum Medical Improvement as of December 30, 1997, and assessed Hayter's Permanent Partial Impairment rating at five percent.[4]  *Id.*

On February 25, 1998, Hayter returned to Dr. Marion with complaints of "aching pain" in her palms that radiated to her forearms.  R. 205.  Dr. Marion noted that Hayter "was not as hypersensitive" as in previous examinations, and stated that he expected Hayter's "hypersensitivity to improve with time."  R. 205 - 06.  Dr. Marion again stated that Hayter did not need further medical treatment, and noted that Hayter was seeking a new job because she felt that her current job exacerbated her upper extremity problems.  R. 206.

Hayter stopped working sometime in September 1999, and alleges disability as of September 30, 1999.  R. 70, 416.  On her alleged onset date, Hayter was driving when she struck a pedestrian. R. 86, 113.  Hayter, however, did not seek medical treatment until June 8, 2000, the date Hayter visited Alan Newman, a chiropractor.[5]  R. 113.  Hayter reported experiencing headaches and neck, left arm, and low back pain following her 1999 motor vehicle accident, and also reported experiencing no pain prior to her accident on September 30, 1999.  *Id.*  Dr. Newman's examination revealed tenderness upon digital palpation of the C4-C5, C5-C6, and C6-C7 spinous process; superficial muscle spasm of the paravertebral musculature; spastic, tender paramuscular spasms along the

---

[4]Black's Law Dictionary defines "maximum medical improvement" as "[t]he point at which an injured person's condition stabilizes, and no further recovery or improvement is expected, even with additional medical attention." BLACK'S LAW DICTIONARY 1000 (8th ed. 2004).

[5]Dr. Newman's notes and findings from the June 8, 2000 visit are contained in a letter written by Dr. Newman on September 21, 2000.  *See* R. 113 - 17.

longissimus column; hypoestesis at C5 and C7 dermatome bilaterally; bilateral weakness of the trapezius muscles; and that all cervical ranges of motion were painful at the cervical spine.  R. 114. Dr. Newman found no evidence of neurological deficits, and stated that her lower extremities were "functioning normally."  R. 115.  Hayter had decreased range of motion in her cervical, thoracic, and lumbar spines, and palpation of the lumbar spine revealed paraspinal muscle spasms of moderate intensity.  R. 114 - 15.  X-rays revealed vertebral subluxations at the cervical and lumbar levels and a straightening of the cervical and lumbar curve.  R. 115.  Dr. Newman prescribed therapy "of a conservative nature," including mild spinal manipulations, ortho-galvanic therapy, traction, interferential stimulation, application of moist heat, hydrotherapy, and massage.  R. 116.

On June 30, 2000, Dr. Samy F. Bishai, M.D., examined Hayter for an Initial Orthopaedic Consultation.  R. 86, 107 - 09.[6]  Hayter complained of numbness in her left hand; problems with dropping objects; headaches; and pain in her neck, back, left shoulder, and arms.  R. 107.  Dr. Bishai's physical examination revealed limited range of motion in her cervical and dorsal lumbar spine.  R. 108.  The neurological examination and sciatic nerve stretching test were normal, and straight-leg testing was seventy-five degrees on both her right and left sides.  *Id.*  Dr. Bishai noted tenderness overlying the cervical and lumbar spine, paraspinal muscle spasms, and moderate pain and muscle spasm in the trapezius muscles.  R. 86.  Dr. Bishai diagnosed lumbosacral strain, cervical strain, and dorsal muscle strain, and prescribed Darvocett and Naprosyn for pain.  R. 109.  He further advised Hayter to continue treatment with Dr. Newman.  *Id.*

---

[6]The record includes notes from the Initial Orthopaedic Consultation, as well as a Medical Report dated August 17, 2000 in which Dr. Bishai summarizes findings from Hayter's earlier visits.  R. 86 - 89.

On July 29, 2000, Dr. Vincenzo Giuliano, M.D., performed an MRI of Hayter's cervical and lumbar spine. R. 106. According to Dr. Giuliano, the MRI of her cervical spine revealed: 1.) hypertrophy at C4-C5 with superimposed broad disc herniation resulting in moderate central stenosis without direct cord impingement or foraminal stenosis; 2.) disc bulges at C6-C7, T1-T2 with mild ventral impingement of the thecal sac; and 3.) significant loss of cervical lordosis. *Id.* The lumbar spine MRI showed no "significant degenerative changes," but revealed: 1.) central and right paracentral herniated disc at L5-S1 with moderate central stenosis and significant narrowing of the right lateral recess; 2.) broad herniated disc at L4-L5 with mild central stenosis and significant narrowing of both lateral recesses without foraminal stenosis; and 3.) annular disc bulge at L2-L3 with minor thecal sac impingement. R. 167.

In a handwritten referral slip dated August 29, 2000, Dr. Newman referred Hayter to "Dr. Horvath" for cortizone shots, stating that Hayter "has reached [maximum medical improvement with] chiropractic treatments." R. 130. On September 5, 2000, Dr. Newman conducted examinations to test Hayter's spinal range of motion. R. 121-24. The lumbar spine test revealed a nine percent spinal impairment, resulting in a "Final Whole Person Impairment" rating of nine percent related to Hayter's lumbar spine. R. 122. The other test of Hayter's cervical spine showed a fifteen percent spinal impairment with a Final Whole Person Impairment rating of fifteen percent. R. 124. Dr. Newman also conducted tests of Hayter's abilities to pinch, grip, and sustain gripping. R. 125 - 28. The test results demonstrated normal to mild deficits in her ability to pinch, moderate to severe deficits in her ability to grip, and incomplete results in her ability to sustain gripping, although Hayter gripped approximately twelve to thirteen pounds with her right hand for approximately one second. R. 125 -

-25-

28.  On the same date, Dr. Newman wrote a note to excuse Hayter from work for September 5 and 6, 2000 "due to exacerbation of injuries."  R. 129.

On September 13, 2000 Dr. Juanita Brown, D.O., examined Hayter upon referral from Dr. Newman.  R. 136.  Hayter reported that the pain in her back and neck was constant, and she rated her pain as a nine on a scale of one to ten (with ten being the worst pain).  *Id.*  Dr. Brown diagnosed lumbar discs syndrome without myelopathy; spinal enthesopathy; cervical disc disease; somatic dysfunctions; and low back and neck pain.  R.137 - 38.  Dr. Brown also treated Hayter with Procaine injections to the lumbar and sacral ligaments.  R. 139.  According to Dr. Brown: "[r]elief of local pain was accomplished and relief of the referral patter of pain was obtained."  *Id.*  Dr. Brown further stated that Hayter "tolerated the procedures well and left the office in good condition."  R. 140.  Dr. Brown noted that Hayter might be required to undergo repeated injections in order to obtain the "best therapeutic effect."  R. 139.

According to a facsimile dated September 21, 2000 from Dr. Brown to Dr. Newman, Hayter cancelled her follow-up appointment with Dr. Brown because the injections were "too painful" and because Hayter did not like needles.  R. 135.  In notes also dated September 21, 2000, Dr. Newman summarized his earlier visits with Hayter, and reported placing Hayter on "full disability as she is not able to continue work as a residential house cleaner."  R. 117.  He further opined that Hayter had "reached the point of therapeutic improvement and has suffered a 10% partial impairment to the body as a whole . . ."  *Id.*  On December 4, 2000, Hayter filed her claim for disability insurance benefits.  R. 47 - 49.

On January 18, 2001, Dr. Gloria Barros, D.O., a state agency non-examining physician opined as to Hayter's physical RFC.  R.142 - 49.  According to Dr. Barros, Hayter could lift fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and sit for approximately six hours in an eight-hour workday; and push and pull without limitation.  R. 143.  Dr. Barros also noted that Hayter could occasionally kneel and crouch, but had no manipulative, visual, communicative, or environmental limitations.  R. 144 - 46.

On July 9, 2001, Dr. Francisco Rosillo, M.D., performed a consultative examination.  R. 150-52.  Hayter complained to Dr. Rosillo that she could not lift more than five pounds, and that she had constant lower back pain that radiated from the lower cervical spine to her shoulders and her left leg.  R. 150.  Dr. Rosillo's examination revealed "normal" manual dexterity, right grip strength of 5/5, and left grip strength of 4/5.  R. 161.  Hayter's gait was normal, and she was able to walk a steady line on her toes and heels, although Hayter could not squat or hop.  *Id.*  Hayter's spine was tender, and the range of motion was somewhat restricted in her cervical spine and very restricted in her lumbar spine.  *Id.*  Dr. Rosillo diagnosed chronic lower back pain due to a herniated disc of the lumbar spine, and chronic neck pain due to a herniated disc of the cervical spine.  R. 152.  Dr. Rosillo also opined that Hayter could not walk more than half a block; could not lift more than ten pounds of weight; and could only remain seated or standing for twenty to twenty-five minutes for two hours of a six-hour workday.  *Id.*

On July 26, 2001, Dr. M. deleCerna, M.D.,  a second non-examining state agency physician, completed a physical RFC assessment.  R. 153 - 60.  Dr. deleCerna opined that Hayter could perform the  physical  exertional  requirements  of  light  work.  R. 159.   Hayter  could  lift  twenty pounds

occasionally and ten pounds frequently; stand, walk, and sit for six hours in an eight-hour workday; and push and pull without limitation. R. 154. Dr. deleCerna noted that Hayter's dexterity was normal, with a right grip of 5/5 and a left grip of 4/5, and that Hayter could walk unassisted with a normal gait. R. 155. The doctor also opined that Hayter had no manipulative limitations. 156.

Hayter reported experiencing a third motor vehicle accident on August 3, 2001. R. 352, 369 (Hayter's testimony from the first ALJ hearing on September 21, 2002). The record includes radiology reports dated August 3, 2001 from the Florida Hospital Medical Center/Winter Park Memorial Hospital, but no other hospital reports from that date. R. 161 - 62. According to the radiology reports, the x-ray of Hayter's cervical spine indicates "a reversal of left or right and torticollis in the cervical spine," with possible "minimal" degenerative changes. R.161. Hayter's lumbar spine x-ray revealed scoliosis and degenerative changes. R. 162. Both x-rays showed no fractures. R. 161 - 62.

On August 9, 2001, Dr. Bishai examined Hayter, and diagnosed lumbosacral strain; cervical strain; dorsal muscle strain of the back; and lumbar disc and cervical disc syndrome. R. 174. Dr. Bishai reviewed Hayter's August 3, 2001 x-rays, and noted the straightening of her cervical spine and normal lumbar lordosis. *Id.* Dr. Bishai conducted a neurological examination, and found no neurological deficits. R. 173. Dr. Bishai prescribed Naprosyn and Darvocett, and recommended that Hayter undergo another MRI and continue to see Dr. Newman. R. 174. In a follow-up examination on September 5, 2001, Dr. Bishai noted no change in Hayter's condition. R. 171.

An MRI of Hayter's lumbar spine dated August 13, 2001 revealed: 1.) small central disk herniation at L4/L5, resulting in mild ventral thecal sac impingment "with interval stability to prior

-28-

examination dated 7/29/00"; and 2.) right paracentral disc herniation at L5/S1, resulting in moderate ventral thecal sac impingment and narrowing of the right lateral recess, "with interval stability to prior examination dated 7/29/00."  R. 164.  The cervical spine MRI revealed: 1.) small central disc herniation at C4/C5, resulting in mild ventral impingement of the subarachnoid space, "apparently evolved since prior examination dated 7/29/00"; 2.) mild residual loss of cervical lordosis (hypolordosis), that was possibly indicative of persistent segmental dysfunction; and 3.) "apparently resolved" disc bulges in the lower cervical spine.  R. 165.  Hayter also underwent a CT scan for her persistent headaches.  R. 163.  The CT scan report dated September 27, 2001 revealed normal results, and demonstrated "[n]o localizing pathology."  *Id.*

On October 4, 2001, in a letter addressed to Hayter's counsel, Dr. Newman summarized his examination findings and opinions from treatment of Hayter since August 16, 2001 (after her third motor vehicle accident).  R. 208 - 12.  Dr. Newman stated diagnoses of acute cervical sprain/strain; cephalgia with dizziness; cervical disc protrusion; cervicobrachial syndrome; lumbar sprain/strain; lumbar disc syndrome; and sciatica neuralgia with weakness.  R. 211.  Dr. Newman prescribed the same treatments as he did in 1999 (treatment of a "conservative nature" including mild spinal manipulations, hot and moist heat, and massages), but added recommendations for ultrasound and spray and stretch therapies.  *Id.*  Dr. Newman opined that Hayter suffered a "permanency" as a result of her August 3, 2001 motor vehicle accident.  *Id.*  He further opined that "considering [Hayter's] symptoms, results of comparative tests, and past experiences with similar cases, . . . [Hayter] has reached a point of therapeutic improvement and has suffered a 14% permanent partial impairment to the body as a whole . . ."  R. 212.  Dr. Newman further stated that because Hayter received a ten

-29-

percent permanent impairment as a result of her 1999 motor vehicle accident, and a twenty percent impairment related to her 1986 injury to her right arm and wrist, Hayer had a "superimposed impairment rating combined" of forty-four percent.  R. 212.

On October 16, 2001, Dr. Bishai saw Hayter for a follow-up examination.  R. 170.  Dr. Bishai stated that Hayter had no neurological deficits, and noted that Hayter "seems to be doing slightly better than [her] last visit."  *Id.*  He advised her to continue her treatment with Dr. Newman.  *Id.*

The ALJ conducted her first hearing on September 10, 2002.  R. 352.  At the hearing, Hayter testified that she did not use any assistive devices for walking, and that as of the date of the hearing, she was only taking medication for her high blood pressure, vitamins, calcium pills, ibuprofen, and "old pain pills" prescribed by Dr. Marion for her 1997 CTS surgeries.  R. 366 - 67, 375.  Hayter stated that she could not afford new medicines, and was only seeing Dr. Newman, a chiropractor who could not prescribe medication.  R. 367.  Hayter stated that she did not use a back brace; had a TENs unit for a "little while"; and that she did not want to undergo surgery because she was afraid of becoming paralyzed.  R. 367 -68.  She testified that her pain was constant, and that any movement aggravated her pain.  R. 368.

Hayter was able take care of her own personal hygienic needs, but stated that she has problems dropping objects because of weakness in her hands related to CTS.  R. 376 - 77.  Hayter also testified she had not sought treatment for her CTS since her previous surgeries.  R. 377.  According to Hayter, she was able to lift no more than ten pounds, and sit for no more than ten minutes.  *Id.*  Hayter further testified that she had been seeking treatment mainly for her blood pressure but also for her pain at "Good Shepherd's Hope," a health clinic for approximately one year.  R. 386.  On October 21, 2002,

the ALJ issued her first decision finding Hayter disabled from September 30, 1999 through August 12, 2001.  R. 244, Finding 13.

In a letter addressed to the "Disability Determination Office" dated October 25, 2002, Dr. Newman, stated that the August 13, 2001 MRI showed no changes in Hayter's herniated discs since the July 29, 2000 MRI.  R. 271.  He further stated that Hayter "has not been able to obtain any positive results" after four years of therapy with him.  *Id.*  Dr. Newman also stated that "Hayter continues to be placed on total disability at this time. [Hayter's] current symptoms of complaints and the results of the MRI's unfortunately do not allow her to work at this time."  R. 272.

On November 21, 2002, Dr. Giuliano revised his findings from Hayter's August 13, 2001 cervical and lumbar spine MRI's.[7] R. 277 - 78.  In both reports, Dr. Giuliano opined that Hayter's disc bulges were "physiologic," and should *not* be included in Hayter's "overall assessment." R. 277 - 78. His revised cervical MRI also demonstrated: 1.) central disc herniation at C4-C5, resulting in mild ventral impingement on the subarachnoid space with "no interval improvement" from the MRI dated August 13, 2001; and 2.) loss of cervical lordosis (attributed to persistent segmental dysfunction and fixation) which "should be considered in the overall assessment of [Hayter's] impairment." R. 277. The revised lumbar spine showed: 1.) right paracentral disc herniation, resulting in moderate ventral thecal sac impingement with focal narrowing of the right lateral recess and assumed direct impingment of the traversing right S1 nerve root with "[n]o interval improvement" since the July 29, 2000 MRI;

---

[7]Dr. Giuliano's reports state that on November 21, 2002, he revised his findings on an August 13, 2002 cervical spine MRI, and an August 13, 2001 lumbar spine MRI.  R. 277 - 78.  The correct date for Hayter's original cervical spine MRI is August 13, 2001.  *See* R. 163 - 64.

and 2.) central disc herniation at L4/L5, resulting in mild ventral thecal sac impingment with "no interval improvement" since the July 29, 2000 MRI..  R. 278.

On May 17, 2004, in a letter addressed to "Disability Determinations," Dr. Newman stated that Hayter could not sit or stand for more than fifteen minutes at a time, and that Hayter continues to "regress" and that her condition is "now considered permanent in nature." R. 269.  The following day, on May 18, 2004, Dr. Bishai examined Hayter, and observed that she was "doing about the same as her last visit." R. 273.  Dr. Bishai performed a neurological examination, which revealed no signs of neurological deficits. *Id.*  Hayter's sciatic nerve stretching test was also negative. *Id.*  Dr. Bishai recommended that she continue her medications, and advised Hayter to return for follow-up visits when necessary. R. 274.  Dr. Bishai further opined that Hayter had chronic neck and back problems as a result of her motor vehicle accident injuries, and stated that Hayter is "totally and permanently disabled from work." *Id.*

## 1.    Testimony at the Second ALJ Hearing

On September 21, 2004, the ALJ held a second hearing after remand from the Appeals Council. R. 408.  At the hearing, Hayter complained of constant neck and back pain, as well as back spasms and headaches. R. 416 - 17.  Hayter stated that she was taking pain medication prescribed by Dr. Bishai and Alleve. R. 417.  Hayter does not use an assistive device to walk, but she typically stays in bed or sits in a chair during the day. R. 420.  She stated that her automobile insurance covers eighty percent of her medical care with Dr. Newman and Dr. Bishai. R. 422.  Hayter also testified that she could stand for approximately ten to fifteen minutes at one time, but that her legs were "giving out more" since August 2001. R. 424.  Hayter complained that she cannot grab small objects, and has

-32-

problems dropping objects.  R. 427 - 28.  She treats her hands by soaking them in Epsom salt.  R. 428.

Hayter also complained of numbness in her hands, and stated that her visits with Dr. Newman were

the only medical treatment she receives for the numbness.  R. 432 - 33.

The ALJ also heard testimony from a VE.  R. 434 - 38.  The VE testified that Hayter would

not be able to perform any of her past relevant work, but stated that Hayter would be able to perform

the sedentary unskilled jobs of ticket checker, surveillance system monitor, and food and beverage

order clerk.  R. 436 - 37.

### 2.   New Evidence Submitted to the Appeals Council

As discussed earlier, after the ALJ's decision — but before the Appeals Council decision —

Hayter submitted additional medical records from July 29, 2000 through November 2002.  R. 6 - 10,

329 - 39, 340 - 41.  The additional records included reports from Shepherd's Hope, Inc. covering the

period from August 21, 2002 through November 22, 2002.  R. 10, 329 - 39.  The records show that

Hayter received mammograms and a PAP smear at Shepherd's Hope, Inc.  R. 329 - 39.  In a note dated

October 23, 2002, a manager at Shepherd's Hope, Inc. explains that health center is staffed by

volunteers, and that the center provides "family practice doctor visits."  R. 329.  According to the

manager, Hayter did not receive orthopaedic treatment because no orthopaedic doctors or

chiropractors had volunteered their services.  R. 329.

Hayter also submitted a letter from Dr. Giuliano dated February 14, 2005.  R. 340 - 41.  In the

letter, Dr. Giuliano summarized his previous findings as to Hayter's cervical and lumbar spine MRI's

from July 29, 2000 and August 13, 2001.[8]  R. 340.  Dr. Giuliano stated that Hayter had a "Class 3 impairment of the cervical spine, indicating moderate clinical impairment, based on the presence of a central disc herniation at C4/C5, resulting in mild spinal stenosis, and permanent hypolordosis . . . ."  *Id.*  Dr. Giuliano also repeated his findings on Hayter's lumbar spine as stated in his November 21, 2002 revised MRI report.  R. 341.  He also noted that the central disc herniation at L4-L5 resulted in "moderate degree spinal stenosis."  *Id.*  Dr. Giuliano further opined that Hayter had "permanent neurologic deficits and clinical impairment based upon the positive findings shown[,]" and that "there [was] a reasonable degree of medical probability of permanent restriction in normal function, encompassing both sensory deficits and motor impairment."  *Id.*

## B.      THE ANALYSIS

### 1.      The Appeals Council's Decision to Deny Review

Hayter first contends that the Appeals Council did not properly evaluate the new evidence she submitted to the Appeals Council after the second ALJ decision.  Docket No. 15 at 18.  According to Hayter, the evidence was "new and material," and therefore, the Appeals Council improperly denied review.  *Id.* at 18 - 20.  The Commissioner counters that the only "final decision" of the Commissioner that is subject to review by the district court is the ALJ 's decision, and not the Appeals Council's decision to deny review.  Docket No. 16 at 5 - 6.  The Commissioner also argues that the Court must evaluate the additional evidence under the standards for submitting new evidence to the Court.  *Id.*

---

[8]In the letter, Dr. Giuliano states that Hayter visited his office three sets of MRI's on July 29, 2000, August 13, 2001, and August 13, 2002.  R. 340.  Other than Dr. Giuliano's reports (dated November 21, 2002) that incorrectly state he was revising an August 13, 2002 cervical spine MRI, R. 277, Hayter never submitted a record of an MRI dated August 13, 2002.  The correct date for Hayter's original cervical spine MRI is August 13, 2001.  *See* R. 163 - 64.

The Commissioner contends that the additional evidence was not "material" and could not reasonably have been expected to change the administrative result.  Docket No. 16 at 6 - 9.

According to the Appeals Council, the Shepherd's Hope, Inc. records were "cumulative to earlier and later reports" already considered by the ALJ.  R. 7.  The Appeals Council further noted that Dr. Giuliano was not a treating or examining physician, and his "vague" statement that Hayter's impairment "justifies social security disability compensation . . . is a conclusion on issues reserved for the Commissioner of Social Security, and is given no weight."  *Id.*

Both Hayter and the Commissioner urge this Court to use the wrong standard to evaluate the "new evidence" submitted to the Appeals Council.  *See* Docket Nos. 15 at 18 - 19; 16 at 4-6.  The Appeals Council's denial of review is a final decision of the Commissioner that is subject to review under 42 U.S.C. § 405(g).  *Williams*, 407 F. Supp. 2d at 1302-03.  When evidence is submitted *only* to the Appeals Council, the case may be remanded under sentence four, and need not be evaluated under the three-prong standard[9] for remand under sentence six of 42 U.S.C. § 405(g).  *Id.* at 1303.

Nevertheless, under *either* standard, the Court finds no error in the Appeals Council's evaluation of Hayter's new evidence.  Hayter's Shepherd's Hope, Inc. records mainly show treatment for unrelated matters (mammograms and PAP smears), R. 329 - 39, and Dr. Giuliano's letter merely summarizes his previous findings based on past MRI's.  R. 340 - 41.  Further, Dr. Giuliano's letter states "moderate clinical impairment" of Hayter's cervical spine and "moderate degree spinal stenosis" of Hayter's lumbar spine.  R. 340.  Dr. Giuliano's other statements regarding the permanent nature of

---

[9]To satisfy the criteria for remand under sentence six of 42 U.S.C. § 405(g), the claimant must establish that the new evidence submitted to the Court is: 1.) new and non-cumulative; 2.) material and would reasonably be expected to change the administrative result; and 3.) good cause exists for the failure to submit the evidence at the administrative level. *Keeton,* 21 F.3d at 1068.

Hayter's "neurologic deficits" and "permanent restriction in normal function[,]" R. 341, do not support Hayter's contentions that the Appeals Council should have denied review, or that Hayter is disabled. The Appeals Council properly rejected Dr. Giuliano's opinions based on the fact that he was not a treating or examining physician, and that the statements were vague and related to issues reserved for the Commissioner. *See* R. 7. Remand is unnecessary on this issue.

## 2.    Hayter's Upper Extremity Impairments

Hayter next alleges that the Commissioner erred by failing to make a specific finding as to whether Hayter's upper extremity impairments affected her ability to perform the requirements of unskilled sedentary work. Docket No. 15 at 22 - 23. More specifically, Hayter alleges that the ALJ failed to consider the effects of her chronic bilateral CTS, cervical spine radiculopathy, upper extremity pain, numbness, and gripping problems, and how those impairments would affect Hayter's ability to perform the manipulative tasks required for most sedentary work. *Id.* at 21. The Commissioner argues that the ALJ properly considered all of Hayter's impairments, and accurately determined Hayter's RFC in light of these impairments. Docket No. 16 at 9 - 12.

First, Hayter is incorrect that the ALJ failed to consider all of Hayter's impairments. Following a review of the medical and other record evidence, the ALJ found that Hayter retained the RFC to perform the physical exertional requirements of sedentary work. R. 22, Finding 6. Hayter could lift a maximum of ten pounds; was limited in her abilities to bend and stoop; and had to avoid prolonged periods of sitting, standing, and excessive and repetitive movement of her neck. *Id.* The ALJ specifically mentioned Hayter's history of bilateral CTS and her 1997 surgeries. R. 16. The ALJ also noted Hayter's complaints of numbness and problems with dropping objects, and her bilateral

weakness and limited range of motion in her spine.  *Id.*  The ALJ also summarized Dr. Rosillo's July 9, 2001 consultative examination findings that Hayter's grip strength was 5/5 in the right and 4/5 in the left.  R. 18.

Further, the ALJ specifically stated that Hayter had the "medically determinable severe impairment" of "status-post bilateral carpal tunnel release surgeries."  *Id.*  The ALJ also considered Hayter's subjective complaints and noted that Hayter's activities of daily living reflect that she "lives a sedentary type lifestyle, which is consistent with the medical evidence."  R. 18 - 19.  The ALJ found that Hayter's impairments limited her ability to do heavy lifting, but stated "the clinical findings resulting from these impairments do not appear to be of a degree capable of producing limitations of incapacitating proportion."  R. 19.  The ALJ, therefore, found that Hayter's allegations and subjective complaints were "not fully credibly" and "out of proportion and inconsistent with the medical evidence . . ."  *Id.*

Substantial evidence supports these findings.  On January 14, 1998, Dr. Marion's physical examination revealed "excellent" wrist and digital range of motion, and well-healed incisions on her palms.  R. 207.  Dr. Marion also told Hayter that her motor strength would likely return in one to two years, and that the pain in her palm would diminish.  *Id.*  He further stated that Hayter did not need further medical treatment, and assessed Hayter's Permanent Partial Impairment rating at five percent.  *Id.*

Hayter never sought treatment for CTS after 1998.  Dr. Rosillo's July 9, 2001 showed "normal" manual dexterity, and good grip strength.  R. 161.  The record does not show that Hayter's impairments significantly worsened after her August 3, 2001 motor vehicle accident.  Throughout his

treatment of Hayter, Dr. Bishai recommended extremely conservative care, despite Hayter's complaints of numbness in her hands, problems with dropping objects, and pain.  R. 107 - 09, 170, 173 - 74.  Dr. Bishai never recommended surgery, and merely advised Hayter to take pain medication and continue to see her chiropractor.  *Id.*  Further, in August 2001, October 2001, and May 18, 2004, Dr. Bishai performed neurological examinations and noted that Hayter had no signs of neurological deficits R. 170, 173, 273.  Despite Dr. Bishai's May 14, 2004 statement that Hayter was "totally and permanently disabled from work" – which the ALJ properly rejected as unsupported by his own treating records (R. 20) – Dr. Bishai's treatment notes do not show that Hayter cannot perform sedentary work.

### 3.    Hypothetical Question to the Vocational Expert

Finally, Hayter argues that the ALJ failed to accurately describe Hayter's limitations in her hypothetical questions to the vocational expert.  Docket No. 15 at 23 - 25.  Hayter states that the ALJ should have included Hayter's "bilateral manual dexterity" limitations (including limitations of fine motor dexterity and numbness and tingling in her hands) in her hypothetical to the VE.  *Id.* at 23.  The Commissioner counters that the ALJ's hypothetical question to the vocational expert was a complete and accurate assessment of Hayter's limitations and abilities.  Docket No. 16 at 12 - 16.  The Commissioner is correct.

During Hayter's second hearing, the ALJ asked the VE a series of hypothetical questions that assumed work restrictions similar to Hayter's impairments.  The ALJ asked the VE to assume an individual of Hayter's age and work background who "would need to avoid excessive and repetitive movements of the neck and back"; who would be "limited in heavy lifting, bending, stooping"; and

who had to avoid "prolonged periods of sitting and standing."  R. 436.  The ALJ asked if this individual would be able to perform any of her past relevant work or any other work.  *Id.*  The VE responded that the individual would not be able to perform any of her past relevant work, but stated that she would be able to perform the sedentary unskilled jobs of ticket checker, surveillance system monitor, and food and beverage order clerk.  R. 436 - 37.  The VE further testified that her answer did not change on assuming that the individual could only perform "simple, routine, repetitive tasks."  R. 437.

The ALJ then asked the VE to assume an individual who:

> could stand for two hours of an eight-hour day, sit for six hours of an eight-hour day, would have to alternative standing and sitting, she would need to avoid excessive, repetitive movements of her neck and back, she would be limited in bending and stooping, she could lift 10 pounds occasionally and frequently . . .

R. 437.  The ALJ again stated that the individual could only perform "simple, routine, repetitive tasks."  *Id.*  The VE responded that the individual could perform the unskilled sedentary jobs previously mentioned.  *Id.*  On cross-examination, counsel for Hayter asked the VE whether numbness and tingling in the hands that "prohibited fine dexterity" could affect the individual's ability to perform the listed jobs.  R. 437 - 38.  The VE responded affirmatively.  R. 438.  The VE further stated that if the individual had to lay down periodically throughout the day, this requirement would also affect her ability to perform the jobs she mentioned.  R. 438.

As discussed earlier, the record does not indicate that Hayter's "bilateral manual dexterity" limitations and numbness and tingling in her hands restricted her capacity to work.  Again, the ALJ specifically mentioned Hayter's subjective complaints and the medical records related to Hayter's CTS, her 1997 surgeries for CTS, and grip strength testing.  R. 16, 18.  The ALJ's hypothetical to the

-39-

VE and findings as to Hayter's RFC accurately described Hayter's impairments and limitations.

Remand is unwarranted.

## VI.    **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk

should enter a judgment and close the case.

**DONE AND ORDERED** this 22nd day of September, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia       30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL            33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817